UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| BKCAP, LLC, GRAYCAP, LLC, | ) |
| and SWCAP, LLC, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 3:07-cv-00637 |
| | ) |
| CAPTEC FRANCHISE TRUST | ) |
| 2000-1, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

### I. INTRODUCTION

The Court is faced with another series of motions by the Defendant, Captec Franchise Trust, 2000-1 ("Lender"),[1] and these fare no better than any of its previous motions. Lender filed its Motion for Partial Summary Judgment (Docket # 162), on May 17, 2010. Citing almost no authority and disregarding the Seventh Circuit Court of Appeal's admonition in this case that extrinsic evidence was required to resolve the breach of contract issue, *BKCAP, LLC v. CAPTEC Franchise Trust 2000-1*, 572 F.3d 353, 355 (7th Cir. 2009) ("*BKCAP II*"), Lender claims that it is nonetheless entitled to judgment as a matter of law. Specifically, the Lender argues that the Plaintiffs (collectively, "Borrowers") failed to provide the proper form of prepayment notice, that the Lender's rejection of the attempted prepayment notice was not a breach of contract, and that the Borrowers waived their prepayment right. (Def.'s Br. 1.) The Lender has also filed a

---

[1] For ease of reference, Captec Franchise Trust will be referred to as the "Lender," even though it is an assignee of the original lender.

1

Motion to Strike (Docket #170) the Fourth Affidavit of John C. Firth, which the Borrowers submitted as part of their Response. As will be discussed, both of the Lender's motions must be DENIED.

## II. FACTUAL AND PROCEDURAL HISTORY

The Borrowers are wholly owned subsidiaries of Quality Dining, Inc., an Indiana corporation that owns approximately 170 restaurants in Indiana, Michigan, Pennsylvania, and other states. (First Firth Aff. ¶¶ 3, 7.) In 1999, Quality Dining sought to pay down its bank debt by mortgaging thirty-four of its restaurants. (*Id*.) These mortgage agreements form the core of the present dispute.

In August 1999, the Borrowers obtained eighteen secured loans from the Lender and twelve secured loans from third-party G.E. Capital with terms between fifteen and twenty years, totaling $49 million. *Id*. at ¶ 6.) The Lender provided its standard-form Promissory Note for each loan, which included a "Prepayment Premium" if the Borrowers extinguished the loan before it was fully amortized. (Pls.' Designation of Evid. Ex. 13.) Upon the Borrowers' request, however, the Lender made two revisions to the agreement: the Lender waived the right to the Prepayment Premium after ten years and it was to be "calculated based on the stream of monthly payments from the payoff date through the tenth anniversary of the note." (First Firth Aff. ¶ 18.)

Accordingly, Section 3 of each note provided:

> **3. PREPAYMENT.** If no Event of Default (as hereinafter de fined) then exists Borrower shall have the right to prepay all, but not a portion of, the principal balance of this Note together with accrued interest thereon on any Payment Date; provided, however, that Borrower shall provide no less than thirty (30) days prior written notice to Lender of Borrower's intention to prepay (the "<u>Prepayment Notice</u>"). Once given, the Prepayment Notice

> may not be withdrawn, and the failure to prepay in accordance with the Prepayment Notice shall constitute an Event of Default . . . .
>
> Lender shall not be required to accept any tender of prepayment of the principal balance of this Note at any time during the first ten (10) "loan years" when the "Reinvestment Rate" (as hereinafter defined) is lower than the Stated Rate unless the Lender also receives from Borrower a sum of money (the "<u>Prepayment Premium</u>") which shall be equal to the positive difference between the present value (computed at the Reinvestment Rate) of the stream of monthly payments of principal and interest under this Note from the date of the prepayment through the tenth (10th) anniversary of the First Full Payment Date at the Stated Rate (without duplication of either the Default Rate or the late charges set forth in Section 4 below) and the outstanding principal balance of this Note as of the date of the prepayment (the "<u>Differential</u>"). In the event the Differential is less than zero, the Prepayment Premium shall be deemed to be zero. For purposes of this Note, the "<u>Reinvestment Rate</u>" is an interest rate equal to the then current yield on United States Treasury obligations . . . .

(Pls.' Designation of Evid. Ex 1, p. 2, § 3.)

During discussions in April 2007 regarding a loan for a restaurant in Cherry Hill, New Jersey, that was destroyed by fire, the parties discovered that they disagreed on the formula for calculating prepayment penalties.[2] In June 2007, the Borrowers prepaid the sixteen G.E. Capital notes and five others that had been assigned to Capmark f/k/a GMCA. (First Firth Aff. ¶¶ 11, 12.) In both instances, the parties agreed to a prepayment penalty calculated "as the difference between the present value of the stream of monthly payments from the date of prepayment through year 10 computed at the Reinvestment Rate and at the Stated Rate." *BKCAP II*, 572 F.3d at 357.

The next month, the Borrowers attempted to prepay the twelve remaining Notes held by the Lender. During a July 3, 2007, phone conference, the Lender's "Servicer," the Bank of New

---

[2] The parties eventually resolved their dispute on this Note. This fire appeared to trigger a casualty provision waiving the Prepayment Premium for properties suffering over fifty percent loss of appraisal value. (Pls.' Designation of Evid. Ex. 15.) The Lender demanded $105,000 for the Prepayment Premium on the Cherry Hill loan, whereas the Borrowers calculated $20,000, if the casualty term did not apply. (Second Firth Aff. ¶ 14.)

York ("B.N.Y."), informed the Borrowers that it would reject on behalf of the Lender any prepayments not calculated using the Lender's proposed methodology. (First Firth Aff. ¶ 24.)

The Borrowers responded the same day with a letter stating:

> Prepayment Notice
> . . . [W]e intend to prepay all of the Loans referenced on Exhibit A. This letter is intended to serve as the Prepayment Notice, as defined in the Notes, for all the Loans listed on Exhibit A subject to your concurrence with the methodology set forth on Exhibit A . . .. We look forward to hearing from you after you have had an opportunity to consider the foregoing.

(Second Firth Aff., Ex. 7.) Because each loan contract contained a thirty-day waiting period before payment could occur, August 3, 2007, represented the earliest possible prepayment date, and the Borrowers subsequently based their damage calculation on a proposed prepayment date of September 1, 2007. (First Firth Aff., Ex. 2; Pls.' Compl. ¶ 24.) "The Trust promptly rejected the Borrowers' prepayment notice," asserting that the Borrowers must make prepayments under the methodology it laid out for the Cherry Hill property. (First Firth Aff. ¶ 24.) B.N.Y. reaffirmed this position in a telephone conference on July 17, 2007. (Second Firth Aff. ¶ 19.)

Determined to prepay, the Borrowers sent another letter on October 4, 2007, informing the Trust that both G.E. Capital and Capmark f/k/a GMCA agreed with their, the Borrowers, methodology and asking the Lender to reconsider the matter. (Third Firth Aff., Ex. 1.) The Lender again responded with a rejection (First Firth Aff. ¶ 24), and B.N.Y. emailed the Borrowers, arguing that the contract did not support their calculations and that evidence that other parties agreed with the Borrowers was "immaterial." (First Firth Aff., Ex. 16.)

With further negotiations unavailing, the Borrowers filed suit on October 15, 2007, seeking a declaratory judgment to establish the meaning of the Prepayment Premium and damages for the Lender's alleged breach of contract. (Pls.' Compl. ¶¶ 19, 24.) Specifically, the

4

Borrowers argued that the Lender breached the contract by rejecting the prepayment based on their formula. (*Id*. at ¶ 21.)

Both sides moved for summary judgment (Docket # 22, 25), forcing the Court to rule on whether the contract was ambiguous. *BKCAP, LLC v. Captec Franchise Trust 2000-1*, No. 3:07-cv-637, 2008 WL 383393, at *5,6 (N.D. Ind. Aug. 12, 2008) ("*BKCAP I*"). Judge Nuechterlein held that the contract's unambiguous text supported the Lender's interpretation. The contract's plain language, however, also produced, in his view, an "absurdity." *Id.* at *5, 12-13. Consequently, the Court found that the contract included a "balloon payment" not present on the face of the contract that the Lender argued would obviate the "absurdity." *Id.*

The Seventh Circuit Court of Appeals reversed on appeal, holding that the contract was ambiguous because its plain language, although clear, resulted in an absurdity which could not be cured by adding the extraneous "balloon payment." *BKCAP II*, 572 F.3d at 357-58. The Borrower's interpretation was also rejected, based on the record, thus preventing the Court of Appeals from construing the ambiguous language against the drafter and in the Borrowers' favor. Without a clear view of the contract's meaning, the Court of Appeals could not determine whether the Lender breached: "[T]he contract is ambiguous, making it inappropriate to resolve the meaning of the contract at the summary judgment stage." *Id*. at 355. Thus, it remanded the case to this Court for trial, where the parties could offer extrinsic evidence concerning their intent. *Id*. at 362. The Borrowers subsequently paid nine notes on September 1, 2009, and three notes remain outstanding.

On May 17, 2010, the Lender filed the present Motion (Docket # 159), in which it argues that the prepayment notice was not proper because it was conditioned upon their acceptance of the Borrowers' methodology. Thus, the Lender claims, the Borrowers failed to meet a condition

precedent to prepayment. (Def.'s Br. 5.) Additionally, the Lender argues that its disagreement with the Borrowers does not rise to the level of a breach of "any specific term in the Notes." (*Id*. at 6.) Finally, it asserts that the Borrowers waived their prepayment right by not prepaying. (*Id*. at 7.)

The Borrowers deny all three propositions. Specifically, they claim that the July 2007 letter, the October 2007 letter, and the Complaint (Docket # 1) all "put Lender on notice of Borrowers' 'intention to prepay' . . . and that is all the Notes require." (Pls.' Br. 14.) Furthermore, they charge the Lender with hindering their ability to satisfy the condition by insisting upon a "[f]aulty" prepayment penalty calculation. (*Id*. at 17.) This breach, they claim, caused damages of $1,246,555.25 in "excess" interest incurred on the nine prepaid notes between the attempted prepayment on October 1, 2007, and the actual prepayment of nine of the notes on September 1, 2009. (Pls.' Br. 12.) Additionally, the Borrowers claim $113,477.59 in finance charges paid on the three outstanding notes, which continue to accrue interest. (*Id*. at 13.) Finally, the Borrowers deny any waiver, arguing that filing suit instead of paying at the higher rate did not voluntarily and intentionally waive their prepayment right and, in any event, waiver is a fact question inappropriate for summary judgment. (*Id*. at 20-21.)

### III. STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(c); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th

Cir. 2005).

When ruling on a motion for summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a fact finder." *Payne*, 337 F.3d at 770. The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.*; *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable fact finder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id*. However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id*. at 771.

## IV. DISCUSSION

The Lender presents three arguments in support of summary judgment. First, it claims that the Borrower's notice is invalid because it conditions prepayment on the Lender's acceptance of the Borrowers' methodology and consequently did not fulfill a condition precedent to the contract. Additionally, the Lender maintains that its rejection of the prepayment notice did not constitute a breach of contract. Alternatively, the Lender claims that the Borrowers' failure to prepay waived any right to do so. Ultimately, none of the Lender's arguments warrant summary judgment.

A. Alleged Failure of Prepayment Notice to Fulfill Condition Precedent

In an undeveloped argument lacking any supporting case law, the Lender asserts that the

Borrowers failed to signify in the notice an unqualified intent to prepay when they conditioned prepayment on their own methodology. (Def.'s Br. 5.) Borrowers make three responses: the notice adequately conveyed their intent to prepay, which is all the contract requires; the contract's notice provision is ambiguous and must be construed against the Lender; and the Lender's rejection excused fulfillment of the condition, thus acting as a waiver. (Pls.' Br. 14-17.) Stated simply, the Borrowers argue that they fulfilled the condition, but that if they did not, it is the Lender's fault, and that besides, since no special form of notice was required, their July 3rd letter was sufficient.

A condition precedent is a condition that must occur or be satisfied before the contract takes effect or "a condition which must be fulfilled before the duty to perform an already existing contract arises." *Sand Creek Country Club, Ltd. v. C.S.O. Architects, Inc.*, 582 N.E.2d 872, 875 (Ind. Ct. App. 1991). *See also Harbor Park Mkt., Inc. v. Gronda*, 743 N.W.2d 585, 588 (Mich. Ct. App. 2007); *Acme Mkt., Inc. v. Fed. Armored Exp., Inc.*, 648 A.2d 1218, 1220 (Pa. Super. Ct. 1994). Conditions precedent are not favored, and to be enforced they must explicitly and clearly display the parties' intention to create a condition. *See Real Estate One v. Heller*, 724 N.W.2d 738, 741 (Mich. Ct. App. 2006); *Scott-Reitz Ltd. v. Rein Warsaw Assocs.*, 658 N.E.2d 98, 103 (Ind.App. 1995); *Boro Constr., Inc. v. Ridley Sch. Dist.*, 992 A.2d 208, 216 (Pa. Commw. Ct. 2010). While no magic words are necessary to create a condition precedent, "[s]uch terms as 'if', 'provided that', or 'on condition that'", can indicate a condition. *United Elec. Co., L.P. v. Allstates Mech. Ltd.*, No. 01555, 2004 WL 1386239, at *2 (Pa. Com. Pl. June 17, 2004) (citing *Cal-Tex Lumber Co., v. Owens Handle Co.*, 989 S.W.2d 802, 809 (Tex. Ct. App. 1999)).

The core issue in cases dealing with the fulfillment of conditions precedent is whether the

party satisfied the "plain language of the contract in light of the surrounding circumstances." *Star of Detroit Line, Inc. v. Comerica Bank*, No. 198090, 1999 Mich. App. Lexis 2002, at *11-12 (Mich. Ct. App. Feb. 16, 1999); *see also City Line Joint Venture*, 82 Fed. Cl. at 316 (stating that notice provision was assessed "in terms" of the contract). For notice provisions, this can entail examining the contract to discover if it required a certain form of notice. *Patel v. United Inns, Inc.*, 887 N.E.2d 139, 146, 149 (Ind. Ct. App. 2008). In *Patel*, the court liberally construed an email notification as satisfying a contract provision calling for written notice to be "addressed to the party to be notified" and delivered personally, through U.S. Mail, or through FedEx. *Id.* at 145, 146.

In the present case, both parties agree that the prepayment notice was a condition precedent to the right to prepay under the contract. (Pls.' Br. 14; Def.'s Br. 5.) The contract explicitly conditions the right to prepayment upon providing notice: the Borrowers could prepay, "provided, however, that Borrower shall provide no less than thirty (30) days prior written notice." (Pl.'s Designation of Evid. Ex 1, p. 2, § 3.) Other courts have treated prepayment notices as conditions precedent. *See Cmty. Convalescent Ctr. of Naperville, INC. v. First Interstate Mortgage Co. of Ill.*, 537 N.E.2d 1162, 1164 (Ill. App. Ct. 1989) (holding that thirty day written notice requirement was a condition precedent to prepayment); *In re H.P. Tool Mfg. Corp.*, 12 B.R. 600, 602 (Bankr. E.D. Pa. 1981) (same). The issue therefore is whether the Borrowers' conditional prepayment notice satisfied that condition precedent.

The contract between the parties simply required that the Borrowers provide written notice of their intent to prepay at least thirty days prior to the payment. (Pls.' Designation of Evid. Ex 1, p. 2, § 3.) The condition is not ambiguous—the plain language spells out its requirements. The contract does not specify the form or content of the notice nor does it suggest

9

that the notice must include payment terms or that their inclusion would be improper. The Lender never objected to the adequacy of Borrowers' prepayment notice on the Cherry Hill property, which resembled its subsequent notice at issue here. (Second Firth Aff., Ex. 1.) Indeed, on that occasion, both letters clearly state that the document itself constitutes notice and both indicate a prepayment amount to which the Lender objected. Moreover, the notification in dispute here was captioned, "<u>Prepayment Notice</u>," and the Borrowers first line told Lender that they "intend to prepay all of the Loans." (Second Firth Aff., Ex. 7.) After the brief, and redundant, indication that the letter constituted the prepayment notice subject to agreement on the formula, the Borrowers again stressed that "it is important . . . to close on our refinancing as promptly as possible." *Id*. The dispute developing over the ambiguous formula did not implicate or in any way change the contract's notice provision.

The scant case law regarding the adequacy of prepayment notices supports the Borrowers' position. In the closely analogous case of *U.I.P Limited, L.L.C. v. Lincoln National Life Insurance Co.*, the Court accepted the sufficiency of a prepayment notice that was similarly qualified upon the lender's acceptance of the borrower's prepayment formula. No. CV09-0006-PHX-NVW, 2009 WL 4497233, at *3-12 (D. Ariz. Nov. 30, 2009). That same result appears appropriate here.

At the very least, the letter put Lender on notice that once the parties reached an agreement, the Borrowers intended to prepay. This would "provide no less than thirty (30) days prior written notice to Lender of Borrower's intention to prepay." (Pl.'s Designation of Evid. Ex 1, p. 2, § 3.) In short, Borrowers informed the Lender that they intended to prepay the loans at least thirty days before payment, which was all the contract required.

B. Rejection of Notice as Breach of Contract

The Lender fills its second argument with more hairsplitting. It claims to have searched the contract in vain for any particular obligation they breached. Indeed, it goes so far as to assert that "[t]he notes do <u>not</u> require the Trust to agree with, accept, or acquiesce to Plaintiffs' calculation of the prepayment provision." (Def.'s Reply Br. 3.) Essentially, the Lender argues that it only rejected a calculation, not an actual or attempted prepayment. And, the argument goes, because no specific provision prohibited them from rejecting the formula, doing so did not constitute a breach of contract. *Id*. at 3-4. Additionally, the Lender implies that because the calculation it rejected was allegedly held to be "unreasonable" by the Seventh Circuit Court of Appeals, no breach can arise from its mere rejection. *Id*. at 3. Instead, Lender characterizes the whole episode as a "'good faith disagreement'" rather than an actionable breach. *Id*. at 4. Finally, as part of a recurring refrain, the Court is once again told that the Borrowers have no damages resulting from the Lender's actions. *Id*. at 5.

Lender's arguments are unconvincing because the Court cannot determine if a breach occurred until it defines the prepayment provision. First, the Lender misconceives the Seventh Circuit's ruling. While the Court of Appeals rejected the Borrowers' facial interpretation of the contract, it left open the possibility that upon remand extrinsic evidence could prove the Borrowers' assertions correct. As a result, the Borrowers might actually have offered proper prepayment. After all, the contract clearly provided Borrowers with the right to prepay: "Lender shall not be required to accept any tender of prepayment of the principal balance of this Note at any time during the first ten (10) 'loan years' . . . . unless the Lender also receives from Borrower a sum of money (the '<u>Prepayment Premium</u>')." (Pls.' Designation of Evid. Ex 1, p. 2, § 3.) If the Borrowers attempted to exercise this right, and the Lender prevented them from

11

doing so, a breach occurred. Thus, the argument seems to come down to a rather silly question: Did the Borrowers have to actually write the Lender a check, or could they take their word that the amount would not be "entertain[ed]?" (First Firth Aff. ¶ 24; Ex. 16.) In short, the answer is foreordained—any attempt by the Borrowers to tender payment, except, of course, an utter capitulation to the Lender's demand, would have been futile.

It is well-established that the law does not require a party to perform futile acts. *Tri-Olm v. Buys*, No. 279347, 2008 WL 4277462, at *3 (Mich. Ct. App., Sept. 18, 2008) (citing *Modern Globe, Inc. v. 1425 Lake Drive Corp*, 66 N.W.2d 92 (Mich. 1954) (performing "useless acts" is not required). Tendering a payment certain to be rejected is a futile act. *Messina v. Silberstein*. 364 A.2d 959, 961-62 (Pa. Super. 1987) (citing *Williams v. Barbaretta*, 59 A.2d 161 (Pa. 1948) (holding that it would be futile for party to tender payment after it was informed that the other side is not ready to accept payment)); *Sunseri v. Mancuso*, 66 A.2d 830, 830 (Pa. 1949) (stating that tender of payment is unnecessary when it is known that the other party will not perform under the contract); *Stefanac v. Cranbrook Educ. Cmty.*, 458 N.W.2d 56, 68 n.6 (Mich. 1990) (Levin, J., dissenting) (articulating that tender unnecessary when the other party showed that it would reject it); *N. Side Asphalt & Material Transp., Inc. v. Foreman*, 520 N.E.2d 457, 459 (Ind. Ct. App. 1988) (explaining that tender unnecessary when party is notified of other side's intent not to perform).

Lender provided Borrowers sufficient evidence that it would reject any prepayment. Through its servicer, B.N.Y, Lender had already rejected a tendered prepayment on the Cherry Hill property because of a similar dispute on prepayments. (Second Firth Aff. ¶ 9, Ex. 5.) Lender also gave Borrowers no indication that tendering payment in this dispute would lead to a different result. Indeed, Borrowers state that the "Trust promptly rejected Borrowers'

prepayment notice."[3] (First Firth Aff. ¶ 24.) B.N.Y.'s follow-up letter on October 11, 2007, stated that Borrowers' proposed prepayment was too low and that "BNY is unable to deviate from the defined prepayment calculations . . . . [and] is unable to entertain any request for a reduction of Borrowers' required prepayment penalties." (First Firth Aff. ¶ 24, Ex. 16.) This effectively informed the Borrowers that the Lender would not accept their prepayment and any effort to do so would be rejected. Consequently, the law does not impose upon the Borrowers any obligation to actually test this assertion by the physical tendering of a prepayment.

Finally, Lender disclaims any causal responsibility for Borrowers' damages, arguing that they created their own injury by not prepaying. (Def.'s Br. 5; Def.'s Reply 6.) Borrowers respond that the damages are a direct result of the Lender's refusal to accept prepayment. In short, they argue that because of the Lender's prepayment rejection, they paid roughly $1.3 million more in continuing interest. (Pls.' Br. 19.)

To recover under a breach of contract, the non-breaching party's damages must flow "naturally and ordinarily result from the breach" and "be proved with reasonable certainty." *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652, 662 (Pa. 2009). *See also Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50, 52-55 (Mich. 1980); *Miljevich Corp. v. N. Country Bank & Trust*, No. 268356, 2007 WL 2331051, at *3 (Mich. Ct. App. Aug. 16, 2007); *Indianapolis City Mkt. Corp. v. MAV, Inc.*, 915 N.E.2d 1013, 1024 (Ind. Ct. App. 2009). In

---

[3] Lender makes an unconvincing argument that the Borrowers lack evidence that it acted inconsistently with the Notes. (Def.'s Br. 6.) It cites, in a footnote, the Second Affidavit of Quality Dining's President, John Firth, who stated that "[a]t no time during that call [on July 17, 2007] or otherwise, did . . . . [B.N.Y.] reject Borrowers' prepayment notice, or claim that the Firth letter of July 3, 2007, was deficient as a prepayment notice." (Second Firth Aff. ¶ 19.) Thus, Lender implies that even if notice rejection is an actionable breach, there is no proof that it did this. However, this is more hairsplitting, picking out one statement in a host of evidence that shows the Lender was unwilling to accept prepayment. Mr. Firth's statement regards only B.N.Y., and is not inconsistent with his previous assertion that the Trust rejected the notice. Regardless, B.N.Y.'s letter to Firth (First Firth Aff. ¶ 24, Ex. 16) certainly conveyed that message. Additionally, at the summary judgment stage, the Court must read the evidence in a light favorable to the non-moving party, which requires treating the Lender's response as a rejection.

other words, the Borrowers must prove that the breach was a substantial factor in bringing about the injury. *Parke State Bank v. Akers*, 659 N.E.2d 1031, 1034-35 (Ind. 1995).

Lender's argument fails to prove that no genuine issue of fact exists as to the existence and cause of Borrowers' damages. Once again, the Lender points to the Borrowers' failure to tender prepayment and claims that all it did was disagree with the Borrowers' formula. As a result, the Lender asserts that it did not act or fail to act contrary to the contract. The Court has already resolved this false distinction, however, and that result applies here as well. If the Borrowers' interpretation, viewed with extrinsic evidence, is correct, then the Lender's breach might have forced the Borrowers to pay more in interest than they would have paid in prepayment.

At this stage, the Borrowers have done all that is required of them, presenting sufficient evidence that could lead the fact finder to hold with "reasonable certainty" that Lender's notice rejection resulted in damages. The Borrowers assiduously sought to pay the loan; it is not speculative to claim that had the Lender agreed on the formula, the Borrowers would have prepaid. The Borrowers have offered evidence that not being able to prepay resulted in additional costs they otherwise would have avoided. (Fourth Firth Aff.¶ 7-13, Exs. 1-4.)[4] Thus,

---

[4] The Lender has also filed a Motion to Strike the Fourth Affidavit of John C. Firth (Docket # 169, Ex. A), submitted as part of the Borrowers' Response to the Motion for Summary Judgment. The Lender claims that affidavit is not based on personal knowledge and advances numerous other summary objections. (Docket # 170.)

A motion to strike must be made with specificity and cannot rest on summary objections. *See Lewis v. Horace Mann Ins. Co.*, 410 F.Supp.2d 640, 647 (N.D. Ohio 2005) ("In a motion to strike, the moving party must specify the paragraphs of an affidavit to which it objects."); *De Guzman v. Parc Temple, LLC*, 537 F.Supp.2d 1087, 1089 n.1 (C.D. Cal. 2008) (A party that "cites all or most of a paragraph in the declaration and makes multiple objections without specifying which objection pertains to which statement in the paragraph" fails to preserve any alleged error; such "objections are not specific and are denied.").

Here, the Lender's Motion ignores the fact that in Paragraph 1, Firth states that he has personal knowledge of the facts contained in the affidavit. (Docket # 169, Ex. A.) Furthermore, the Motion merely objects to the affidavit in a conclusory and wholesale fashion because it purportedly contains speculation, includes "inadmissible statements of opinion, conclusions, or legal conclusions", is filled with hearsay, violates the parol evidence rule, and violates the best evidence rule. Because, however, the affidavit is based on personal knowledge and the Lender makes no specific objections, the Motion to Strike is DENIED.

the rejection could be considered a substantial factor or cause in fact of the damages.

C. Waiver of Right to Prepay

Lender adds, almost as an afterthought, that the Borrowers—who began this suit to secure their right to prepay—somehow waived this right by not actually prepaying. (Def.'s Br. 7.) This contention stands on the erroneous distinctions already dealt with and must fall with them as well.

Waiver is "universally" defined as a voluntary and intentional relinquishment of a right. *United States v. Hodgeskins*, 832 F.Supp. 1255, 1259 (N.D. Ind. 1993). *See also N. Ind. Commuter Transp. Dist. v. Chicago S. Shore & S. Bend R.R.*, 685 N.E.2d 680, 695 (Ind. 1997); *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258 (Mich. 2003); *Commonwealth ex rel. Penn. Attorney Gen. Corbett v. Griffin*, 946 A.2d 668, 679 (Pa. 2008). "To constitute a waiver of legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it." *Commonwealth*, 946 A.2d at 679 (quoting *Brown v. Pittsburgh*, 186 A.2d 399, 401 (Pa. 1962)). Waiver is an affirmative defense and the burden of proof rests with the party asserting it. *Redar v. Allstate Ins. Co.*, 497 N.E.2d 566, 569 (Ind. Ct. App. 1985); *Cadle Co. v. Kentwood*, 776 N.W.2d 145, 157 (Mich. Ct. App. 2009); *Coover v. Saucon Valley Sch. Dist.*, 955 F.Supp. 392, 406 n.12 (E.D. Pa. 1997).

The Lender has not provided, nor has the Court discovered, any cases suggesting that instituting a suit to enforce a contractual right amounts to a voluntary and intentional waiver of that right. The Lender's suggestion that Borrowers dithered after trying to prepay not only ignores that they instituted the present lawsuit, but also highlights the fact that the Lenders have failed to show the *sine qua non* of waiver—the "decisive" surrendering by the Borrowers of a

known right. *See Commonwealth*, 946 A.2d at 679. If, therefore, the Lender demanded a higher premium than the formula permitted, the Borrowers' failure to pay was not a voluntary waiver, but a response to the Lender's own breach.

## V. CONCLUSION

For the foregoing reasons, the Defendant's Motion for Partial Summary Judgment (Docket #162) is DENIED. Similarly, the Defendant's Motion to Strike (Docket # 170) is also DENIED.

SO ORDERED.

Enter for August 12, 2010

<u>S/Roger B. Cosbey</u>
Roger B. Cosbey
United States Magistrate Judge