**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| **BKCAP, LLC, GRAYCAP, LLC, and** ) | |
| **SWCAP, LLC,** ) | |
| ) | |
| **Plaintiffs / Counterclaim Defendants,** ) | |
| ) | |
| **v.** ) | **CAUSE NO.  3:07-cv-637** |
| ) | |
| **CAPTEC FRANCHISE TRUST 2000-1,** ) | |
| ) | |
| **Defendants / Counterclaim Plaintiffs.** ) | |

## OPINION AND ORDER

### I. INTRODUCTION

These Findings of Fact and Conclusions of Law follow a two-day bench trial held on May 3-4, 2011, focused on what the Borrowers and the original Lenders really intended when they included an ambiguous pre-payment premium in 34 separate promissory notes as part of a $49 million mortgage financing deal.

The focus of the trial stemmed from a ruling by the Seventh Circuit Court of Appeals after summary judgment was granted in favor of the Defendant, Captec Franchise Trust 2000-1 ("the Trust"), an assignee of an original Lender, on the declaratory judgment and breach of contract claims brought by the Plaintiffs, BKCAP, LLC, GRAYCAP, LLC, and SWCAP, LLC (the "Borrowers").  In short, the Seventh Circuit reversed the District Court's conclusion that the pre-payment premium language was unambiguous and should be read as supporting the Trust's interpretation. *BKCAP, LLC v. Captec Franchise Trust*, No. 3:07-cv-637-CAN, 2008 WL 3833939 (N.D. Ind., Aug. 12, 2008), rev'd 572 F.3d 353 (7th Cir. 2009) ("*BKCAP I*").

The Seventh Circuit essentially determined that while the contract language defining

1

the pre-payment premium was clear, it was nonetheless ambiguous because it made no economic sense; that is, the formula (if literally followed) would never impose a penalty in the event of pre-payment. Since such an absurdity—a pre-payment penalty that never exacts a penalty—could not have been the intent of rational business entities, the case was remanded for trial on what was intended by this particular provision.[1]

At trial, the Borrowers argued that the original contracting parties modified a standard form note to accommodate a bargained-for privilege; that is, the Borrowers were granted the right to pre-pay a note without penalty after ten years and to pre-pay with a non-punitive pre-payment premium if the pay-off was within the first ten years. The Borrowers maintain that their interpretation of the pre-payment formula is supported by: (1) a confirmatory discussion at the July 1999 loan closing, and (2) the fact that except for the Trust's 12 notes, the holders of all the other 21 notes accepted payment in 2007 (within the first ten years) using the Borrowers' methodology for the pre-payment premium.[2] Thus, the Borrowers seek a declaration that their interpretation is the correct one, and ask for damages.

The Trust, on the other hand, argues that all the documentation surrounding the transaction shows that the original parties intended a "make-whole" or "yield maintenance" pre-payment premium so that any holder (including, of course, the Trust's investors) would receive all of the expected principal and interest on their investment through at least the first

---

[1] Following remand, the case was reassigned to the undersigned Magistrate Judge in accordance with 7th Cir. R. 36. (Docket # 83.) The Magistrate Judge has jurisdiction under 28 U.S.C. § 636(c) and the Court has jurisdiction under 28 U.S.C. § 1332. *See also* Op. and Order, Sept. 24, 2009 (Docket # 91.)

[2] The notes at issue here are serviced for the Trust by the Bank of New York ("BNY"). As will be discussed more fully later, all 34 notes were eventually securitized and sold to institutional investors. One note held by the Trust was, by agreement, paid off early without penalty after a fire loss.

ten years.  The Trust claims that the Borrowers' arithmetic calculation (which the Borrowers assert was approved at the closing and honored by the other holders) is about $800,000 shy of making the investors whole and does not maintain the expected yield and that instead, a balloon payment, which does not expressly appear in the loan contracts, must be incorporated into the equation.

Following the trial and preparation of a transcript,[3] counsel submitted post-trial briefs and responses, as well as proposed findings of fact and conclusions of law.  After examining the entire record, considering the arguments of counsel, and determining the credibility of the witnesses, the Court makes the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a) based upon a preponderance of the evidence.

## II. FINDINGS OF FACT[4]

The Borrowers are wholly-owned subsidiaries of Quality Dining Inc. ("QDI"), a large restaurant franchisee company with approximately 170 different fast-food restaurants, mostly "Chili's" and "Burger King," scattered throughout several states, including Indiana, Michigan, and Pennsylvania. (Tr. 7, 12.)  John Firth ("Firth") joined QDI in 1996 as its general counsel, advanced to executive vice-president in 1998, and now serves as president. (Tr. 9-11.)  By early 1997, and for reasons unrelated to this lawsuit, QDI was in serious financial distress. (Tr. 13.)  By mid-1998, and even after a major re-alignment of the business and a down-sizing of

---

[3] Reference to the transcript is made as "(Tr. __)".  Trial Exhibits are referenced as "(Ex. __)" and deposition excerpts are noted as "(__ Dep. __)".

[4] Any Finding of Fact deemed to be a Conclusion of Law is hereby incorporated into Section III and any Conclusion of Law in Section III deemed to be a Finding of Fact is hereby incorporated into this Section.

personnel, QDI still needed to refinance its unsustainable $110 million bank indebtedness. (Tr. 14-16, 21.)

With its already high debt load, QDI pursued alternative financing and solicited loan proposals from niche lenders to the franchise restaurant industry, entities such as FFCA, Captec, and CNL. (Tr. 16-18, 21.) Captec and CNL aggressively pursued QDI's loan business, but because they were smaller than FFCA, and because QDI's projected loan package was going to be bigger than either could handle alone, they wanted to share the loans. (Tr. 22-23.) Partially for that reason, QDI initially accepted the proposal from FFCA, because, as a major lender, FFCA would be able to quickly close on the loans and deliver the funds. (Tr. 24.) Early in 1999, however, it became apparent that QDI and FFCA were unlikely to come to terms, and QDI again initiated contact with Captec and CNL, who remained eager to make the loans. (Tr. 32.) By the end of April 1999, QDI decided to proceed with the combined loan proposal from Captec and CNL. (Tr. 36.)

QDI identified various Chili's or Burger King restaurant properties that it could mortgage to secure the 34 separate loans, each for about $1-$2 million for a total of $49 million. (Tr. 17, 34-35.) QDI formed 12 special purpose entities as indirect, wholly-owned subsidiaries to administer the loans, three of which, the Borrowers, are the Plaintiffs here. (Tr. 17, 34-35, 144.) Captec originated 18 of the loans, with CNL taking the other 16. (Tr. 41.) Captec also brought in Krass Monroe, an experienced Minneapolis law firm well-known for representing lenders in these types of transactions, who Captec usually used for such deals. (Tr. 23-24; Evans Dep. 46.)

Krass Monroe provided QDI with Captec's standard form promissory note for review.

4

(Tr. 37, 39; Ex.1.)  The standard form note granted the Borrowers the privilege of paying a loan early, but only after the expiration of an unspecified term of years (a "lock-out" provision), and with a "pre-payment premium," defined as:

> equal to the present value (computed at the Reinvestment Rate) of the difference between a stream of monthly payments necessary to amortize the outstanding principal balance of this Note at the Stated Rate and a stream of monthly payments necessary to amortize the outstanding principal balance of this Note at the Reinvestment Rate (the "Differential"). In the event the Differential is less than zero, the pre-payment premium shall be deemed zero. . . .

(Ex. 1; Tr. 43, 46.)

Put another way, if interest rates fell and the Borrowers decided to prepay the Note, they would have to pay a penalty equal to the difference between two variables:

> (1) the present value of the stream of monthly payments provided by the loan's amortization schedule from the date of pre-payment, computed at the "Reinvestment Rate"—i.e., the U.S. Treasury rate at the date of pre-payment; and

> (2) the present value of the same stream of monthly payments computed at the "Stated Rate"—i.e., the stated interest rate of the loan.

(Ex. 1; Tr. 43, 46.)

Firth spear-headed the negotiations on behalf of QDI, and since Captec/CNL pledged that QDI would only have to deal with one contact, he interfaced with Robert Schrader, the Captec representative and a fellow lawyer. (Tr. 44, 46.)  Although Captec's standard note contained the lock-out clause, Schrader offered QDI the ability to pre-pay the notes without penalty after ten years if QDI would agree to 20 more basis points (two-tenths of a percent)—or roughly an additional $100,000 per year. (Tr. 43-44.)  This ultimately boosted the interest rate on the Chili's restaurant loans to 9.94% (Exs. 8-13) and the Burger King restaurant loans to 9.79%. (Exs. 2-7.)  QDI wanted the latitude to pre-pay without penalty after

ten years, so it agreed to Schrader's offer, but in place of any lock-out provision, it also sought

an agreement allowing it to pre-pay within the first ten years provided that any resulting pre-

payment premium would not be punitive. (Tr. 43-45, 375; Ex. PP.)  Captec/CNL agreed to

those points as well. (Tr. 43-45, 375.)

 Krass Monroe, principally through attorney Randy Evans, then created the 34 notes

(each secured by a mortgage) by re-drafting the Captec standard form note in a number of

ways.  Specifically, the pre-payment provision in each of the notes was eventually re-written in

the following manner in an effort to correspond to the agreement between Firth and Schrader:

> Lender shall not be required to accept any tender of pre-payment of the
> principal balance of this Note at any time during the first ten (10) "loan years"
> when the "Reinvestment Rate (as hereinafter defined) is lower than the Stated
> Rate unless Lender also receives from Borrower a sum of money (the
> "Prepayment Premium") which shall be equal to the positive difference between
> the present value (computed at the Reinvestment Rate) of the stream of monthly
> payments of principal and interest under this Note from the date of the pre-
> payment through the tenth (10th) anniversary of the First Full Payment Date at the
> Stated Rate (without duplication of either the Default Rate or the late charge set
> forth in Section 4 below) and the outstanding principal balance of this Note as of
> the date of the pre-payment (the "Differential").  In the event the Differential is
> less than zero, the Pre-Payment Premium shall be deemed to be zero. For
> purposes of this Note, the "Reinvestment Rate" is an interest rate equal to the then
> current yield on United States Treasury obligations having a weighted average
> life to maturity closest in time but prior to the Due Date of this Note, as reported
> in The Wall Street Journal (or any comparable successor publication) on the fifth
> (5th) business day preceding the pre-payment date. . . .

(Tr. 46-47, 62; Evans Dep. 210-211, 219-221; Exs. 2-13 § 3, GG.)

 Each of the revised notes, spanning terms of either 15 or 20 years, also required that the

Borrowers provide a 30-day "pre-payment notice" in accordance with their right to pre-pay.

(Tr. 46-47; Exs. 2-13, GG.)

 In late July 1999, the representatives of QDI and Captec/CNL attended the loan closing

at the offices of Krass Monroe in Minneapolis. It was during the two-day closing that Firth and Schrader finally got down to discussing the actual workings of the so-called non-punitive pre-payment premium contained in Section 3 of the notes. (Tr. 48-60; Exs. 2-13, GG.) To QDI, the pre-payment premium had never been a priority item or "a deal breaker," an understandable point of view given that Firth and QDI were necessarily focused on the immediate effects of this complex deal, and not particularly on a future, uncertain contingency. (Tr. 53, 167.) Thus, this loose end was left to an informal discussion at the closing.

Nevertheless, since the actual calculation of the pre-payment premium had never been discussed, Firth wanted to know "how [the] thing work[ed]" before actually closing the deal. (Tr. 53.) Thus, Firth (and David Findlay, another QDI representative) and Schrader (along with Captec's president, Reed Sherard) adjourned to a conference room where Schrader explained the basic workings of the pre-payment provision.[5] (Tr. 55.)

In effect, Schrader described a calculation involving a number representing the present value of a stream of monthly payments of principal and interest from the date of pre-payment through the ten-year anniversary of the note at the reinvestment rate from which the parties would subtract the present value of the same stream of monthly payments of principal and interest at the stated rate. (Tr. 48, 55.) The "positive difference" between the two numbers would be the pre-payment premium. (Tr. 48, 55; Ex. 32.)

After privately performing a quick calculation based on some assumptions, Firth concluded that Schrader's described pre-payment premium was "tolerable" and not punitive. (Tr. 56.) Firth then returned to check and confirm the accuracy of his calculation with

---

[5] As the Court observed at trial (Tr. 54), the conference room conversations are either "not hearsay" or they fall within a hearsay exception. *See Catalan v. GMAC Mortg. Corp.*, 629 F.3d. 676, 694-95 (7th Cir. 2011).

Schrader (presumably again in the presence of Captec's president). (Tr. 56-57.) Schrader quickly acknowledged the mutual understanding. (Tr. 59-60.) Thus, at closing, Firth and Schrader understood and outwardly manifested their mutual contractual intent that to pay off a note within the first ten years, the Borrowers would have to pay a pre-payment premium based on this methodology, together, of course, with the outstanding principal balance of the note. (Tr. 59-60.)

Firth's testimony recalling the conference room conversation is credible and compelling. His testimony and demeanor revealed a sophisticated business executive who still possessed a clear recall of the loan transaction, even though more than a decade old. Of course, his crisp recollection is believable, given his prior experience as corporate counsel, the searing nature of QDI's then-financial predicament, and the critical need for this prompt financing. After all, Firth was working to save QDI's business, so his mind was understandably concentrated on financial details such as how this particular pre-payment premium would work. Accordingly, his testimony is credited as reliable and accurate on these points.

Schrader's almost total lack of recall, now over ten years later, is also understandable. (Schrader Dep. 30, 42, 44, 59, 329, 332.) Indeed, Schrader, as vice-president of operations for Captec, oversaw the origination and closing of all of Captec's loans, and while the QDI loan was likely attractive because of its size, it was also just one more deal to Schrader, so it is not surprising that his memory about this one is largely empty. (Schrader Dep. 13-15, 20.) On the other hand, although Schrader now claims that as a general proposition he would not have been able at the time to competently discuss the simple mechanics of a pre-payment premium, that

seems unlikely given his education and experience, as well as the fact that he was the one responsible for negotiating all of Captec's other loans. (Schrader Dep. 13-15.) After all, Schrader was apparently well-versed enough in financial affairs to offer QDI the pre-payment privilege in return for an additional 20 basis points; a negotiation position revealing considerable financial knowledge and sophistication.

Eventually, as was expected, the notes were securitized, pooled with similar loans in a $181 million package, and sold through an offering circular to institutional investors ("certificate holders"). (Tr. 368-69; Ex. PP.) That document informed potential investors that certain notes in the investment package (i.e., the Borrowers' in particular) were subject to a pre-payment premium. (Ex. PP p. 47.) In fact, the Borrowers were the only ones in the offering who negotiated a right to pre-pay, as all the others were subject to a "lock-out." (Tr. 375.) The circular warned investors, however, that the pre-payment premium was "not designed to fully compensate [them] for any diminished return on investment which . . . [they] may incur due to pre-payment. . . ." (Ex. PP p. 47-48.)

After the closing, the Borrowers and the Trust had no real contact until early 2007, when a fire destroyed one of the restaurants securing a Captec-originated loan ("the Cherry Hill loan"), now effectively held by the Trust for the certificate holders. (Tr. 68-69; Ex. 14.) During discussions concerning whether the Cherry Hill loan could be pre-paid, Firth and Mike Randall, a BNY vice-president of commercial loans, discovered that they had dramatically different views concerning how the pre-payment premium formula worked and the resulting amount of any penalty. (Tr. 68-69, 74-81, 86-91; Exs. 19, 25.) Although the Cherry Hill loan was eventually pre-paid largely through fire insurance proceeds (and is otherwise not

particularly relevant to this dispute), the Borrowers (who were planning to refinance their outstanding debt) were now alert to the possibility of a dispute and promptly moved forward with their plan to pre-pay all of the notes.

On July 3, 2007, with new financing lined up, and in accordance with the notice requirement in each note (Exs. 2-13, GG), the Borrowers provided BNY with written notice of their intent to pre-pay in full the 12 remaining loans (subject to BNY's concurrence with their pre-payment methodology), for the remaining restaurants in Indiana, Michigan, and Pennsylvania.[6] (Tr. 91-92; Ex. 21.)  In a subsequent telephone conversation on or about July 17, 2007, between Firth and Randall, BNY (again acting and speaking for the Trust) rejected the Borrowers' version of the pre-payment premium and, instead, insisted on a calculation method that inserted a final "balloon payment" of the entire outstanding principal balance at the 120th month. (Tr. 98-101, 121, 451, 465; Ex. 19.)  Randall, it should be noted, never suggested to the Borrowers that the form of their notice was in any way deficient. (Tr. 101.)

While negotiating with BNY, the Borrowers solicited a pay-off quote for the 16 loans held by GE Capital (CNL's successor) and the five owned by Capmark (an assignee servicer for five of the original 18 Captec notes). (Tr. 63-64,107-11.)  GE Capital's treasury department independently calculated the pre-payment premium using the same methodology employed by the Borrowers and arrived at essentially the same amount. (Tr. 98, 100-111; Exs. 21, 33, 34.)  Similarly, Capmark agreed with the Borrowers' interpretation of the pre-payment premium and accepted pre-payment (Tr. 111-15; Ex. 22), after consulting its legal department (Ex. NNN)

---

[6] Specifically, the seven Michigan restaurants are loan numbers 8905, 8910, 8911, 8914, 8916, 8918, and 8919; the four Indiana restaurants are numbers 8907, 8908, 8912, and 8913; and the one Pennsylvania restaurant is number 8920.

and the owner of the five notes, Prudential (Ex. DDD), as well as Jennifer Davis, a Captec Senior Credit Analyst who worked on the original loan. (Tr. 381-82, 389, 402-3.) Thus, with no disagreement on the pre-payment penalty and amounts owed, the Borrowers pre-paid in full all 21 of the GE Capital and Capmark loans in 2007. (Tr. 60-61, 100-10.)

On October 4, 2007, the Borrowers notified BNY that both GE and Capmark agreed with their pre-payment premium methodology and had accepted pre-payment of the other 21 loans. (Tr. 111; Ex. 22.) The Borrowers again urged BNY to re-consider and accept pre-payment of the remaining 12 loans using that calculation. BNY, however, was not persuaded by GE and Capmark's concurrence with the Borrowers' methodology and again rejected pre-payment. (Tr. 119-20; Ex. 23.) That rejection led to commencement of this lawsuit. (Tr. 121.)

The dispute over the calculation of the pre-payment premium centers on the Trust's belief that the loans were intended to achieve "yield maintenance" and in fact, the notes on their face (although not in the section specifically detailing pre-payment) recite: "Pre-Payment Provision: Yield Maintenance Amount First Ten (10) Years." (Exs. 2-13.) As the Trust sees it, this necessarily meant a ten-year "make-whole" pre-payment premium so that the investors could attain the same return ("yield maintenance") on the notes' outstanding principal balance as if the borrower had made all scheduled note payments through the notes' amortization period. Thus, the Trust maintains that the Borrowers' formula is something less than true yield maintenance and not something Schrader or Captec/CNL ever would have agreed to.

In addition to the face of the notes, the Trust points to several documents that were generated before, at, and after the closing—for example, Captec's first proposal to QDI (Ex. E), the form note (Ex. G), Captec's second proposal (Ex. K), the FFCA proposal (Ex. L), a

draft Captec commitment letter (Ex. O), and the final Captec commitment letters (Exs. S, DD)—which each refer, in one form or another, to yield maintenance connected with the loans. The Trust also emphasizes that the loans were securitized and that the parties must have intended total yield maintenance because that was the basis upon which the notes were to be sold to investors. (Ex. PP.)

Ultimately, however, the Trust's position seemingly rests almost entirely on the notion that "yield maintenance" is something akin to a term of art; that is, a concept with essentially one meaning, readily understood by borrowers and lenders alike. The problem with this position, however, is that it is not supported in the record and, in fact, is severely undercut by evidence showing that while perhaps the concept is somewhat generally understood in theory, much like an oblique reference to a liquidated damages clause might be, in actual practice it could mean, as Schrader testified, a "couple of different things" as "every transaction was . . . unique." (Schrader Dep. 24-25; Farren Dep. 98.)

The murkiness surrounding application of the term (at least in this particular niche lending market) is further illustrated by the testimony of Randy Evans, who observed that from what he recalled in memorializing these deals, "yield maintenance" did not have a single meaning among lenders and did not define the pre-payment premium; rather, the specific negotiated language in Section 3 was what governed. (Evans Dep. 221-23.)

Richard Gibson, another attorney with Krass Monroe who worked on the deal, testified that the term "make whole" was used generically to require some sort of additional payment to the lender and that it, and "yield maintenance," were terms "thrown around by borrowers or lenders or other parties as a general reference of some type of pre-payment premium or . . .

[some type of] pre-payment provision in a loan that . . . typically require[d] some more detail in terms of what that might be." (Gibson Dep. 56, 101.)

Finally, Jennifer Davis, who was Captec Financial's underwriter on the loans, testified that, in her view, the Borrowers' version actually achieved yield maintenance, while the Trust's methodology more than doubled that figure. (Tr. 424, 430, 433; Ex. UUU.)

In contrast, Randall, for BNY and the Trust, offered unconvincing testimony about the intent behind the pre-payment premium, particularly since he arrived on the scene well after the negotiation and origination of the loans and never spoke to anyone who was involved at either Captec or CNL. (Tr. 473-75.) Rather, Randall seeks to elevate and conflate "yield maintenance" (which appears only on the face of the notes) and the term "make whole" (which is absent from the notes) into an unassailable term of art, but only because that was supposedly how the notes were ultimately sold to investors through the offering circular. (Tr. 451-52.) The circular, however, does not support Randall's view and, in fact, is quite cautionary about pre-payment premiums, deeming them "not designed to fully compensate" investors for a diminished return. (Ex. PP p. 47-48.)

Moreover, Randall's interpretation of the pre-payment premium here requires, in his view, a balloon payment that simply cannot be derived from any reasonable reading of Section 3. *See BKCAP I*, 572 F.3d at 360 ("[The Trust's] concept of a 'balloon payment' finds no support in the contract language."). Ultimately, of course, the task before the Court is to ascertain the intent of the original parties at the time they crafted this specific pre-payment premium, and this makes Randall's *post hoc* point of view—based almost exclusively on what he believes a generic pre-payment premium term should mean—simply not probative.

Furthermore, the Borrowers' interpretation is not, as BNY seems to imply, devoid of economic sense. In that regard, it is hard to ignore the clear inference that both GE Capital and Capmark must have believed they were receiving "yield maintenance" when they accepted the Borrowers' pay-off of their notes. Indeed, GE Capital separately and independently came to the same calculation as the Borrowers and ultimately Capmark accepted pre-payment after some due diligence efforts, including conferring with Captec's original loan analyst. Moreover, the Borrowers' pre-payment premium was actually structured so that the earlier the pre-payment, the bigger the penalty—effectively discouraging pre-payment, at least for some span of time, to the benefit of the certificate holders. In addition, the Trust ignores that the Borrowers effectively paid a rolling premium of about $100,000 per year through a higher interest rate (or about $700,000 overall) as consideration, at least in part, for the right to make an early pre-payment. And finally, Captec/CNL were eager to make the loans because such deals were profitable, and therefore likely accommodated the Borrowers' request for such a non-standard pre-payment premium (and abandoned as well any notion of a "lock out"), terms they likely would not have extended to a less-valued borrower.

Therefore, the intended meaning of the pre-payment premium in Section 3 of the notes is what Schrader described to Firth at the 1999 loan closing and which was subsequently honored by GE Capital and Capmark. Having paid all installments on time and never being declared in default, the Borrowers did not breach their contracts with the Trust, nor did they ever waive their right to pre-pay the notes. (Tr. 93-94, 283, 452.) Accordingly, the Trust materially breached each of the 12 loan contracts (Exs. 2-13) by rejecting the Borrowers' attempted pre-payment and by insisting upon an excessive pre-payment premium not called for

14

in the notes or intended by the original parties.

As a result of the Trust's breach of contract, the Borrowers were deprived of the benefit of their bargain and suffered damages. By July 2007, the Borrowers had obtained additional credit from the Bank of America and other banks to pay off the 1999 Captec/CNL-originated mortgage loans. (Tr. 121-23; Ex. 21.) The new line of credit provided for a variable interest rate equal to the London Interbank Offered Rate ("LIBOR") (Ex. 30) plus 1.75%, which, as might be expected, was well below the stated rates (either 9.94% or 9.79%) of the 1999 notes. (Tr. 93, 109; Ex. 27.) After securing this credit, the Borrowers timely informed the Trust of their intention to pre-pay the 12 notes on September 1, 2007. (Ex. 21.)

As noted earlier, however, the Trust rejected the Borrowers' attempts at pre-payment. The Borrowers did eventually pre-pay nine of the 12 notes two years later, on September 1, 2009, the first day they could be paid without a pre-payment premium. (Tr. 126, 132; Ex. 29.) The Borrowers later pre-paid one of the remaining three notes in October 2010 without a pre-payment premium (Tr. 138; Ex. 31), and two notes remain outstanding. (Tr. 136, 139.)

Accordingly, for two years, from September 1, 2007, to September 1, 2009, the Borrowers paid the Trust "excess interest"—money over and above the interest and other charges they would have paid under the Bank of America credit line—stemming directly from the Trust's repudiation of their legitimate pre-payment efforts. (Tr. 122; Ex. 29.) Firth testified about the damages (summarized at Exhibit 29) incurred on each note, which can accurately be

summarized as follows:[7]

| Mortgage # | Concept | Store # | A<br>Interest<br>Paid to Captec | B<br>BofA Interest<br>LIBOR + 1.75% | C<br>Pre Payment<br>Penalty | D<br>Interest on<br>Penalty | E<br>A minus (B+C+D)<br>Damages |
|---|---|---|---|---|---|---|---|
| **GRAYCAP,** | | | | | | | |
| 70008920 | Chili's | 60 | 135,092.09 | 54,994.32 | 15,459.76 | 1,217.97 | 63,420.04 |
| **SWCAP,** | | | | | | | |
| 70008913 | Chili's | 100 | 326,645.36 | 130,901.21 | 24,656.59 | 1,942.53 | 169,145.03 |
| 70008914 | Chili's | 600 | 263,982.04 | 105,789.26 | 19,926.50 | 1,569.88 | 136,696.41 |
| 70008916 | Chili's | 1100 | 258,926.21 | 103,763.16 | 19,544.86 | 1,539.81 | 134,078.38 |
| 70008918 | Chili's | 500 | 158,415.82 | 64,489.11 | 18,128.88 | 1,428.25 | 74,369.57 |
| 70008919 | Chili's | 1300 | 112,230.47 | 45,687.63 | 12,843.49 | 1,011.85 | 52,687.50 |
| | | | 1,120,199.90 | 450,630.37 | 95,100.32 | 7,492.32 | 566,976.89 |
| **BKCAP, LLC** | | | | | | | |
| 70008905 | Burger King | 9640 | 230,512.48 | 93,802.02 | 17,071.54 | 1,344.95 | 118,293.96 |
| 70008907 | Burger King | 9349 | 208,408.56 | 84,807.32 | 15,434.54 | 1,215.98 | 106,950.72 |
| 70008908 | Burger King | 9713 | 233,669.90 | 95,086.87 | 17,305.39 | 1,363.38 | 119,914.26 |
| 70008910 | Burger King | 11248 | 206,303.39 | 83,950.66 | 15,278.63 | 1,203.70 | 105,870.40 |
| 70008911 | Burger King | 9461 | 222,698.21 | 92,058.79 | 25,088.65 | 1,976.57 | 103,574.21 |
| 70008912 | Burger King | 10568 | 132,350.86 | 54,711.08 | 14,910.33 | 1,174.69 | 61,554.77 |
| | | | 1,233,943.41 | 504,416.74 | 105,089.08 | 8,279.27 | 616,158.32 |
| **Damages to September 1, 2009** | | | 2,489,235.40 | 1,010,041.43 | 215,649.16 | 16,989.56 | **1,246,555.25** |

Nevertheless, and despite their ability to pre-pay all 12 notes on September 1, 2009 (Tr. 123), the Borrowers kept three notes in force and continued to pay monthly payments at a higher rate of interest purely as a collection hedge, speculating that if they eventually prevailed, by then the Trust may no longer exist or otherwise have assets to satisfy a judgment. (Tr. 138.) No showing was made, however, that either event has, or is likely to occur, making those self-incurred damages otherwise avoidable. After all, the Borrowers could have eliminated these damages, which continue to accumulate, simply by pre-paying the notes (loan

---

[7] The calculation of excess interest damages is made with the following methodology: The excess paid to the Trust from September 1, 2007, to September 1, 2009 (Column A), less the interest the Borrowers would have paid to the Bank of America (Column B), minus the Borrowers' calculated pre-payment premium (Column C) and minus the interest the Borrowers would have paid on the premium at the Bank of America rate (Column D). (Tr. 126-31.) Thus, the Borrowers' damages are the total interest charges they paid for two years less the credit the Trust should receive for those costs the Borrowers would have incurred had they been permitted to pre-pay on September 1, 2007 (A - [B + C + D] = E or the Borrowers' Damages). (Tr. 131.)

numbers 8920, 8916, and 8905) associated with Chili's Store 60, Chili's Store 1100, and Burger King Store 9640, without penalty on September 1, 2009. Accordingly, while the Borrowers are entitled to damages in the amount of $1,246,555.25, as of September 1, 2009, they are not entitled to the purported damages (the "excess interest" they elected to pay) after that date.

Finally, the Borrowers' damages became fixed and ascertainable as of September 1, 2009, and thus they should receive pre-judgment interest, as allowed under the substantive law of Indiana, Michigan, and Pennsylvania. Those differing calculations, however, must also be applied to three separate amounts—linked to the respective loans from Indiana, Michigan, and Pennsylvania—and that process cannot proceed on this record but must await a motion under Federal Rules of Civil Procedure 52(b) and 59(e).

### III. CONCLUSIONS OF LAW

As confirmed in the September 24, 2009, Opinion and Order (Docket # 91), this Court has subject matter jurisdiction by virtue of diversity of citizenship. *See* 28 U.S.C. § 1332(a). As noted by the Seventh Circuit, *see BKCAP I*, 572 F.3d at 359, and this Court, *see BKCAP LLC v. Captec Franchise Trust 2000-1*, No. 3:07-cv-637, 2010 WL 1222187, at *1 n.3 (N.D. Ind. Mar. 23, 2010), and as the parties concede, the notes contain a choice of law provision that applies the law of the state where the collateral (i.e., each restaurant) is located. Accordingly, loan numbers 8905, 8910, 8911, 8914, 8916, 8918, and 8919 are governed by Michigan substantive law; numbers 8907, 8908, 8912, and 8913 are governed by Indiana law; and number 8920 is governed by Pennsylvania law.

The parties do not dispute that the 12 notes at issue are binding and enforceable

17

contracts between the Borrowers and the Trust, as Captec's assignee. Therefore, and as outlined by the Seventh Circuit, the task before the Court is to determine the intended meaning of the inherently ambiguous pre-payment premium contained within each of the notes. *See BKCAP I*, 572 F.3d at 360-62.[8] "Under the substantive contract principles for [Indiana, Michigan, and Pennsylvania], the goal of contract interpretation is to ascertain the parties' intent." *Id.* at 359 (citing *MPACT Constr. Group, LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 906 (Ind. 2004); *City of Grosse Point Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005); *Ins. Adjustment Bureau v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006)). When contract language is ambiguous—as the Seventh Circuit determined the pre-payment provision is here—"an examination of relevant extrinsic evidence is appropriate in order to ascertain the parties' intent." *Id.* To determine the original contracting parties' intent at the time they agreed to the ambiguous pre-payment provision, "any evidence admissible under the rules of evidence is usable to establish the contract's meaning." *Joy v. Hay Group, Inc.*, 403 F.3d 875, 878 (7th Cir. 2005).

In that regard, the Court has determined that the intent of the Borrowers and Lender was to arrive at a pre-payment premium consistent with that described by Firth and confirmed by Schrader during the closing. In sum, the original parties agreed that the pre-payment premium

---

[8] Along with their breach of contract claim, the Borrowers also originally sought a declaratory judgment on the proper meaning of the pre-payment premium. The Trust argues, however, that the declaratory judgment claim is now moot, because the notes can be paid without a premium, as most already have. This argument ignores, however, that the Court must still "declare" the meaning of the pre-payment premium in order to determine if a breach occurred. And in that regard, the Trust does not explain how the purported mootness of the declaratory judgment claim negates its underlying liability on the breach of contract claim.

would be the "positive difference" between:

1) the present value (computed "at the Reinvestment Rate") of the stream of monthly payments of principal and interest under the Note from the date of pre-payment through the tenth (10th) anniversary of the First Full Payment Date; and

2) the present value (computed "at the Stated Rate") of the same stream of monthly payments of principal and interest under the Note from the date of pre-payment through the tenth (10th) anniversary of the First Full Payment Date.

(Tr. 48; Ex. 32.)

Thus, the pre-payment premium for each of the notes is the present value of the stream of monthly payments of principal and interest at the stated rate subtracted from the present value of the stream of monthly payments of principal and interest at the reinvestment rate from the date of pre-payment through the ten-year anniversary of the note. (Tr. 48, 51-57, 66; Ex. 32.)

This interpretation (the one Firth and Schrader contemporaneously understood) harmonizes the terms of the pre-payment provision. *Siegel Transfer, Inc. v. Carrier Exp., Inc.*, 54 F.3d 1125, 1139 (3d Cir.1995) ("Cardinal rule in contract interpretation is that effect must be given to the intention of the parties and to all provisions in the agreement"); *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 252 (Ind. 2005) ("Courts should interpret a contract so as to harmonize its provisions, rather than place them in conflict."); *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 454-55 (Mich. 2003) (explaining that contracts must be construed to harmonize and give effect to all words and phrases to the extent practicable). Section 3 of the notes defines the pre-payment premium as the "positive difference" between two variables—the present value of the stream of monthly payments of principal and interest

from the date of the pre-payment through the tenth anniversary computed (1) "at the Reinvestment Rate" and (2) "at the Stated Rate." (Exs. 2-13, § 3.)  This reading is consistent with the very next sentence of Section 3, which states: "In the event the Differential is less than zero, the pre-payment premium shall be deemed to be zero." (Exs. 2-13, § 3.)

Moreover, significant weight must be given to the fact that the other holders readily, or ultimately, adopted the Borrowers' interpretation. *See ADR N. America, L.L.C. v. Agway, Inc.,* 303 F.3d 653, 657-58 (6th Cir. 2002) (explaining that under Michigan law, the court looks to objective evidence, such as expressed words and visible acts, to determine the intent of the parties); *Peterson v. First State Bank*, 737 N.E.2d 1226, 1229-30 (Ind. Ct. App. 2000) ("[T]he parties' conduct during the course of a contract is relevant to the determination of their true intent."); *Espenshade v. Espenshade,* 729 A.2d 1239, 1243 (Pa. Super. Ct. 1999) ("In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter.") (quotation omitted).

Accordingly, by refusing the Borrowers' attempts at pre-payment and insisting on a contrary calculation of the pre-payment premium, the Trust committed a breach of the contracts.  Stated simply, if a borrower has the right to pre-pay a loan, then the lender necessarily has a corresponding obligation to accept pre-payment and to release its lien on the collateral. *Franconia Assoc. v. United States*, 536 U.S. 129, 142 (2002) ("If [the borrowers] enjoyed a right to prepay their loans at any time, then necessarily the [lender] had a corresponding obligation to accept pre-payment and execute the appropriate releases.") (internal citation omitted).  "Absent an obligation on the lender to accept pre-payment, the

obligation 'to allow' borrowers to prepay would be meaningless." *Id.* "A loan contract of such incomplete design would be illusory." *Id.*

"Failure by the promisor to perform at the time indicated for performance in the contract establishes an immediate breach." *Id.* at 142-43. Thus, in the context of a borrower's right to pre-pay loans, the lender's breach occurs when a borrower's attempts at pre-payment are rejected. *Id.* at 143.

As applicable here, the Trust breached the loan contracts in July 2007 when the Borrowers submitted their written pre-payment notice (Ex. 21 p. 3), which BNY promptly rejected, both orally and in writing. (Tr. 90, 100, 121, 287, 290, 294, 309; Exs. 22-23.); *see also City Line Joint Venture v. United States*, 82 Fed. Cl. 312, 315 (2008) ("In submitting its notice of intent, plaintiff thus attempted to exercise its contractual right to pre-pay its mortgage while utilizing [federal statutory] procedures to accomplish that end. The government's subsequent failure to permit pre-payment and release its control over the use of the property that secured the loan constituted the very breach the *Franconia* Court envisioned.").

The Trust also breached the notes by adamantly insisting on an excessive pre-payment premium calculated with a methodology (a balloon payment, corresponding to the 120th month on the amortization schedule, for example) that was inconsistent with the intent of the original parties. (Tr. 100, 294; Ex. 23.) "A statement of intention not to perform except on conditions which go beyond the contract constitutes a repudiation." *Franconia*, 536 U.S. at 143 (quoting RESTATEMENT (SECOND) OF CONTRACTS, § 250, Comment b); *see also Alaska Pulp v. United States*, 48 Fed. Cl. 655, 659 (2001) ("The archetypical repudiation, therefore, occurs when one party to a contract attempts to unilaterally alter the contract or to condition his performance on

terms that were not part of the bargain.").  Repudiation "ripens into a breach" when "the promisee elects to treat it as such," for example, by filing suit as the Borrowers did here. *Franconia*, 536 U.S. at 143.

Nevertheless, the Trust offers three defenses against the Borrowers' claims.  First, it contends that the Borrowers' breach of contract claim fails because they failed to satisfy all conditions precedent to the loan contracts.  In particular, the Trust argues that the Borrowers' notice of pre-payment was faulty because it was conditioned on the Trust's acceptance of their pre-payment premium formula.  Thus, as the Trust sees it, because it did not accept the calculation, the notice was ineffective by its own terms and therefore the Borrowers failed to satisfy a condition precedent to recovering for any breach. (Def.'s Trial Br. 28.)

Similarly, the Trust argues that the Borrowers waived their breach of contract claim by filing this lawsuit and continuing to pay the notes, instead of paying the Trust's calculated premium and suing to recover the difference.  Apparently, the Trust believes that since the Borrowers elected not to pre-pay the loans in 2007, but to instead bring this lawsuit, they have waived their claims now that the pre-payment period has expired and no premium is currently, or will ever be, due. (Def.'s Trial Br. 27.)

Finally, the Trust claims that the Borrowers' prior material breach of the notes precludes their own breach of contract claim.  The Trust points out that the notes provide that "[o]nce given, the pre-payment notice may not be withdrawn, and the failure to prepay in accordance with the pre-payment notice shall constitute an Event of Default" (Exs. 2-13), and that consequently, because the Borrowers never pre-paid the notes after giving their notice, it was the Borrowers who first breached the contracts.

None of these arguments are persuasive. The Trust first advanced the condition precedent and waiver arguments in a May 17, 2010, motion for partial summary judgment. (Docket # 162.) In that motion, the Trust argued that the Borrowers' claims fail as a matter of law because they failed to fulfill the required conditions precedent to the contracts. The Court rejected this argument, which was largely summary and generally devoid of relevant case law, because the Borrowers' Pre-Payment Notice, despite being conditional, was clearly adequate:

> The contract between the parties simply required that the Borrowers provide written notice of their intent to prepay at least thirty days prior to the payment. ([Exs. 2-13 § 3.]) The condition is not ambiguous—the plain language spells out its requirements. The contract does not specify the form or content of the notice nor does it suggest that the notice must include payment terms [such as being conditioned on the Trust's concurrence with the Borrowers' methodology] or that their inclusion would be improper.

*BKCAP, LLC v. Captec Franchise Trust 2000-1*, No. 3:07-cv-637, 2010 WL 3219303, at *5-6 (N.D. Ind. Aug. 12, 2010) ("*BKCAP II*") (Docket # 174).

The Trust's second attempt at this argument, which is even more summary and undeveloped than the first, fares no better. Simply put, there is no support in the plain language of the notes for the Trust's arguments that a conditional pre-payment notice is ineffective. Conditions precedent are not favored, and to be enforced they must explicitly and clearly display the parties' intention to create a condition. *See Real Estate One v. Heller*, 724 N.W.2d 738, 741 (Mich. Ct. App. 2006); *Scott-Reitz Ltd. v. Rein Warsaw Assocs.*, 658 N.E.2d 98, 103 (Ind. Ct. App. 1995); *Boro Constr., Inc. v. Ridley Sch. Dist.*, 992 A.2d 208, 216 (Pa. Commw. Ct. 2010). The core issue in cases dealing with the fulfillment of conditions precedent is whether the party satisfied the "plain language of the contract in light of the surrounding circumstances." *Star of Detroit Line, Inc. v. Comerica Bank*, No. 198090, 1999 WL 33454888 (Mich. Ct. App. Feb. 16, 1999).

Here, the loan contracts only require the Borrowers to give "no less than thirty (30) days prior written notice to Lender of Borrowers' intention to prepay . . . ." (Exs. 2-13 § 3.)  As the Court noted in its previous ruling on the motion for partial summary judgment, the plain language of the contracts only requires that notice of the intention to pre-pay be given at least 30 days in advance. (Exs. 2-13 § 3.)  The contracts are completely silent on the form the notice must take and certainly cannot be read as precluding a conditional pre-payment notice.  With no evidence of a contrary intent of the parties on this point, the Court will not create or impose such a condition. *See Real Estate OneHeller*, 724 N.W.2d at 741; *Scott-Reitz Ltd.*, 658 N.E.2d at 103; *Boro Constr., Inc.*, 992 A.2d at 216.  Moreover, the supposed condition was one the Borrowers had a right to insist on.  Accordingly, the Trust's argument that the Borrowers failed to fulfill a contractual condition precedent is again unsuccessful.[9]

Similarly, the Trust's renewed argument that the Borrowers waived their breach of contract claim fails once again.  Waiver is "universally" defined as a voluntary and intentional relinquishment of a right. *United States v. Hodgeskins*, 832 F. Supp. 1255, 1259 (N.D. Ind. 1993). *See also N. Ind. Commuter Transp. Dist. v. Chicago S. Shore & S. Bend R.R.*, 685 N.E.2d 680, 695 (Ind. 1997); *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258 (Mich. 2003); *Commonwealth ex rel. Penn. Attorney Gen. Corbett v. Griffin*, 946 A.2d 668, 679 (Pa. 2008).  "To constitute a waiver of legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it." *Commonwealth*, 946 A.2d at 679 (quoting *Brown v. Pittsburgh*, 186 A.2d 399,

---

[9] In this context, the purpose of the 30-day pre-payment notice was to give the Trust time to obtain an alternate or similar investment in anticipation of receiving a pay off and a pre-payment premium.  The Trust can hardly complain about the form of the notice, however, since it worked to frustrate its very purpose.

401 (Pa. 1962)).  Waiver is an affirmative defense and the burden of proof rests with the party

asserting it. *Redar v. Allstate Ins. Co.*, 497 N.E.2d 566, 569 (Ind. Ct. App. 1985); *Cadle Co. v.

Kentwood*, 776 N.W.2d 145, 157 (Mich. Ct. App. 2009); *Coover v. Saucon Valley Sch. Dist.*,

955 F.Supp. 392, 406 n.12 (E.D. Pa. 1997).

In its previous ruling, the Court unequivocally rejected the Trust's argument, yet in

renewing its argument, the Trust has failed to point to any new facts or case law to cause the

Court to reconsider its prior ruling.  Indeed, the Trust's renewed argument largely parrots the

first and again overlooks the *sine qua non* of waiver— "a clear, unequivocal and decisive act"

surrendering a known right. *Commonwealth*, 946 A.2d at 679.  As the Court previously held,

and as is still true, "[t]he [Trust] has not provided, nor has the Court discovered, any cases

suggesting that instituting a suit to enforce a contractual right amounts to a voluntary and

intentional waiver of that right." *BKCAP II*, 2010 WL 3219303, at *8-9.  As such, the Trust's

argument that the Borrowers waived their breach of contract claim must also again fail.

Finally, the Trust argues in the alternative that by failing to pre-pay after giving notice,

the Borrowers committed a prior material breach of the loan contracts that precludes them from

now bringing their own breach of contract claim. *See Harvest Life Ins. Co. v. Getche*, 701

N.E.2d 871, 875 (Ind. Ct. App. 1998) ("We have held that a party first guilty of a material

breach of contract may not maintain an action against the other party or seek to enforce the

contract against the other party should that party subsequently breach the contract."); *Michaels

v. Amway Corp.*, 522 N.W.2d 703, 707 (Mich. App. 1994) ("The rule in Michigan is that one

who first breaches a contract cannot maintain an action against the other contracting party for

his subsequent breach of failure to perform.") (internal quotes omitted); *Widmer Eng'g, Inc. v.*

*Dufalla*, 837 A.2d 459, 467 (Pa. Super. Ct. 2003) ("If a breach constitutes a material failure of performance, then the non-breaching party is discharged from all liability under the contract.").

The Trust argues that "[w]hen [the Borrowers] failed to prepay in accordance with their purported notice, an event of default occurred, and [they] were then in breach of the notes by September 1, 2007." (Def.'s Trial Br. 28.) This argument, however, seriously misstates the facts surrounding the attempted pre-payment. The Borrowers did not simply "fail to pre-pay in accordance with their notice"—the Trust unequivocally rejected their notice and attempts at pre-payment, conditioned as they were on the Trust's acceptance of their pre-payment calculation, and therefore first breached the loan contracts itself by insisting on an incorrect and excessive pre-payment premium. The Trust's defense of prior material breach therefore fails at the outset.

With the Trust having breached the notes by denying the Borrowers their bargained-for right to pre-pay calculated under the non-standard pre-payment premium, the Borrowers are entitled to damages for the two years of excess interest they paid to the Trust in the amount of $1,246,555.25. *See Shepard v. State Auto. Mut. Ins. Co.*, 463 F.3d 742, 748 (7th Cir. 2006) ("The typical recovery for breach of contract is a party's expectation interest (i.e., the benefit of the bargain).") (applying Indiana law); *Ferguson v. Pioneer State Mut. Ins. Com.*, 731 N.W.2d 94, 99 (Mich. App. 2006) ("The proper measure of damages for a breach of contract is the pecuniary value of the benefits the aggrieved party would have received if the contract had not been breached.") (internal quotations omitted); *Trosky v. Civil Serv. Comm'n, City of Pittsburgh*, 652 A.2d 813, 817 (Pa. 1995) ("[R]emedies for breach are designed to protect either a party's expectation interest 'by attempting to put him in as good a position as he would

26

have been had the contract been performed, that is, had there been no breach'; his reliance interest 'by attempting to put him back in the position in which he would have been had the contract not been made'; or his restitution interest '[by requiring] the other party to disgorge the benefit he has received by returning it to the party who conferred it.'") (quoting RESTATEMENT (SECOND) OF CONTRACTS § 344, Comment a).

Accordingly, the Borrowers should receive as damages the benefit of the bargain denied to them by the Trust's breach or repudiation of the loan contracts. Specifically, from September 1, 2007, to September 1, 2009, the Borrowers paid the Trust "excess interest"—money over and above the interest and other charges they would have paid under the Bank of America credit line—stemming directly from the Trust's repudiation of their legitimate pre-payment efforts. (Tr. 122; Ex. 29.) The damage calculation model, displayed graphically at page 16 of this Opinion and Order, yields the following damage amount:

|  | GRAYCAP, LLC | SWCAP, LLC | BKCAP, LLC | TOTAL |
|---|---|---|---|---|
| September 1, 2007, through September 1, 2009 | $63,420.04 | $566,976.89 | $616,158.32 | $1,246,555.25 |

By September 1, 2009, however, all of the notes could have been pre-paid without premium, although the Borrowers chose not to pre-pay three loans (numbers 8920, 8916, and 8905) and keep them as a collection hedge, speculating that the Trust may eventually cease to exist or, perhaps, no longer have assets to satisfy a judgment. (Tr. 138.) The Borrowers failed to show that this has or is likely to occur, however, and under the doctrine of avoidable

consequences (also known as mitigation of damages), they cannot recover for these self-incurred or self-increased damages that occurred after September 1, 2009. *See* 9 CORBIN ON CONTRACTS § 983, p. 836 (interim ed. 2002) ("[A party] will not be given damages for any part of [its] loss that [it] could have avoided by refraining from continued performance or by making reasonable effort."); RESTATEMENT (SECOND) OF CONTRACTS § 350 (1981). *See also Penn. Life. Ins. Co. v. City of River Rouge*, 676 F. Supp. 2d 575, 582 (E.D. Mich. 2009) ("Failure to mitigate reduces the amount of damages obtainable . . . but only to the extent that the plaintiff failed to make reasonable efforts to minimize damages."); *Sheppard v. Stanich*, 749 N.E.2d 609, 611-12 (Ind. Ct. App. 2001) (reiterating that under Indiana law the non-breaching party must mitigate its damages); *Delliponti v. DeAngelis*, 681 A.2d 1261, 1265 (Pa. 1996) ("It is well established that one who suffers a loss due to breach of contract has a duty to make reasonable effort to mitigate . . . damages."). Accordingly, while the Borrowers are entitled to damages in the amount of $1,246,555.25, as of September 1, 2009, they are not entitled to any alleged damages accruing after that date, except of course, prejudgment interest.

Because the amount of their damages is fixed and easily ascertainable as of September 1, 2009, the Borrowers are also entitled to pre-judgment interest. *See Wickens v. Shell Oil Co.*, 620 F.3d 747, 757-58 (7th Cir. 2010) ("Under Indiana law, prejudgment interest is warranted if the damages are ascertainable in accordance with fixed rules of evidence and accepted standards of valuation at the time the damages accrued."); M.C.L.A. § 600.6013; *Brisbin v. Superior Valve Co.*, 398 F.3d 279, 293-94 (3d Cir. 2005) ("Prejudgment interest is a right which arises upon breach or discontinuance of the contract provided the damages are then ascertainable by computation and even though a bona fide dispute exists as to the amount of

the indebtedness.") (internal quotation omitted) (applying Pennsylvania law). The Court, however, will give the parties further opportunity to address, or perhaps stipulate to, the exact amount of pre-judgment interest due and owing through a separate motion to be filed under Federal Rules of Civil Procedure 52(b) and 59(e).

### IV. CONCLUSION

Based on the previous findings of fact and conclusions of law, the Court declares that the parties intended the pre-payment premium to be consistent with that outlined by Firth and Schrader during their conversation at the closing. Thus, the pre-payment premium for each of the notes is the present value of the stream of monthly payments of principal and interest at the stated rate subtracted from the present value of the stream of monthly payments of principal and interest at the reinvestment rate from the date of pre-payment through the ten-year anniversary of the note.

Accordingly, by refusing the Borrowers' attempts at pre-payment and insisting on a contrary calculation of the pre-payment premium, the Trust committed a breach of the contracts and the Borrowers are collectively entitled to damages in the amount of $1,246,555.25, exclusive of pre-judgment interest from September 1, 2009. The Clerk is therefore DIRECTED to enter a judgment in favor of GRAYCAP, LLC, and against Captec Franchise Trust 2000-1 in the amount of $63,420.04; judgment in favor of SWCAP, LLC, and against Captec Franchise Trust 2000-1 in the amount of $566,976.89; and judgment in favor of BKCAP, LLC, and against Captec Franchise Trust 2000-1 in the amount of $616,158.32, through September 1, 2009.

The Borrowers may seek pre-judgment interest by filing a motion under Federal Rules

of Civil Procedure 52(b) and 59(e) to amend the judgment accordingly.[10]


SO ORDERED.

Enter for July 21, 2011.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[10] The Court wishes to once again compliment counsel on the capable and professional manner in which this case was litigated.